UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 2:25-cr-00151-cr |
| | ) | |
| BRIAN WOOD, | ) | |
| Defendant. | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**
**AND REQUEST FOR A DOWNWARD VARIANCE**

Defendant Brian Wood, by his counsel, offers the following memorandum in support of a reasonable sentence and moves the Court to apply a downward variance.

**History and Characteristics**

[redacted] PSR ¶ 61. Brian has always been extremely physically frail. [redacted] He still struggles to maintain sufficient body weight and has very little muscle mass. Brian's physical frailty and vulnerability was compounded by the failure of his parents to protect or to adequately care for him.

Brian was born when his mother, Sarah Wood, was 17, and his father, Sheldon Wood, was 30. Seventeen months after Brian was born, the couple had a second child, Sheldon Wood, Jr., [redacted]. The family lived and worked on a farm raising pigs and sheep, earning barely enough to make ends meet.

When Brian was 5, his father left his mom and started another family with a new partner who was pregnant with his child. PSR ¶ 52. Brian initially visited his father on weekends, but

that did not last. His father's new wife was hostile to relationships between her husband and his children from previous relationships.

When Brian was 8, his stepmother gave birth to a baby girl who died approximately 2 weeks later [redacted]. During this time, Brian was being bullied in school and struggling to make friends; he was emotionally dysregulated and had frequent emotional outbursts, often precipitated by minor events. After a heated quarrel between Brian and his stepmother, his father discontinued contact with him, citing Brian's unmanageable behavior. Brian's father continued weekend visits with Brian's younger brother. This pointed rejection by his father was extremely upsetting to Brian.

[redacted]. [redacted] Brian was relegated to his paternal grandmother's home during his father's parenting time because his mother did not want the extra parenting time.

[redacted]

[redacted] PSR ¶ 52.

Brian's increasingly dysregulated behavior eventually forced his mother to enroll him in therapy. [redacted]

[redacted] PSR ¶ 52.

Conditions at Brian's mother's home were always chaotic and dysfunctional. [redacted] Brian was constantly anxious and on edge. [redacted]

DCF had been monitoring the family for years and finally stepped in to remove Brian from his mother's home. Not long after Brian was placed in foster care, he made threatening statements and was [redacted] moved from the foster home to the notorious Woodside Juvenile Rehabilitation Center. Brian was then rotated through a series of group homes and juvenile detention facilities. PSR ¶ 53. [redacted]. Even after everything he had already endured, Brian

remembers the years he spent in DCF custody as the most painful and traumatic years of his childhood.

Around the age of 16, DCF returned Brian to his mother's care, where he found the situation had changed but had not improved. His mother was living with a male partner who physical abused her. On one occasion Brian attempted to intervene to protect his mother. The boyfriend threw Brian down a flight of stairs [redacted]. PSR ¶ 54. Despite the violence and instability, Brian attended his senior year of high school and graduated at 18. PSR ¶ 67.

Shortly after turning 18, Brian moved out of his mother's home and his anxiety symptoms decreased. For the next two years Brian worked at restaurants, took online courses at the Community College of Vermont, and considered his next steps. Brian struggled to maintain adequate body weight; medical records indicate it was due to food insecurity and poor nutrition. Eager to continue his education and position himself to earn more money, he joined the army with the hopes of gaining financial support for college.

While in basic training, Brian was stationed in Fort Jackson, South Carolina. [redacted] PSR ¶ 64. Brian was discharged from the military [redacted] and returned to Vermont. He bounced between the homes of his mother and maternal grandmother, often leaving his mother's home due to conflict with her boyfriend.

In 2024 Brian experienced a traumatic assault during which he lost consciousness and was unable to recall details of the assault. [redacted] PSR ¶ 62.

Brian is badly wounded and in need of many years of therapy and treatment to recover from a childhood of unimaginable trauma. This is compounded by his many serious health issues. His history gives context to his criminal conduct which explains but does not excuse it. His characteristics are dysfunctions that can be cured and trauma wounds that can be healed. With treatment and supervision, there is good reason to believe that he will not pose a danger to children in the future.

Brian's history and characteristics justify a below-guideline sentence at the low end of the range contemplated by his plea agreement.

**Nature and Circumstances**

Brian's offense conduct arose in the context of his own victimization. The accumulation of traumatic experience, deprivation, and loss overwhelmed Brian's ability to cope and distorted his psychosexual development. [redacted] These facts suggest a family culture that failed to enforce healthy physical and emotional boundaries, particularly for children.

Brian was also raised by parents with a significant age gap. His mother was only 16 when she became pregnant by Brian's 30-year-old father.  While Brian lived with his mother, she was in intimate relationships with men who physically abused her in his presence and were also violent towards him. Raised in an environment where age-gap relationships, intimate partner violence, and [redacted], Brian developed warped perceptions that, with his prosecution in the current case, he is correcting.

Before his arrest, Brian did not understand the harm he was causing. He was not consciously motivated to harm his victims, and he believed that he cared about them. From

Brian's perspective, the girls he exploited were physically developed, which triggered his sexual interest. Brian also convinced himself that the girls he exploited were his emotional equals because they were willing to talk to him and because he felt like they understood him. Brian had always been shunned by members of his own cohort throughout adolescence and into young adulthood. That unfortunate reality, in addition to the traumatic betrayals by his family, caused Brian to come of age in a state of extremely loneliness and in desperate pursuit of sexual and emotional connection.

Brian unconsciously patterned a lifetime of learned manipulation and exploitation in pursuit of the sexual and emotional connections he desperately craved. [redacted] These experiences horribly distorted his understanding of how to find emotional and sexual connection.

Brian is now able to understand and appreciate the terrible harm he caused his victims. Brian is also intelligent and self-aware enough to understand that he is badly wounded and that he needs to heal. Brian is not a person who doesn't care about others. He is a person who convinced himself that he was doing no harm while compulsively and desperately pursuing sexual and emotional gratification. Understanding the harm that he caused and the compulsions that drove him to commit that harm has motivated Brian to get the help he needs so he doesn't hurt anyone else in the future.

**Argument regarding the statutory and guideline range for the offense conduct**

The statutory penalty range and sentencing guidelines for production were originally conceived for offenders who were pedophiles and child sexual abuse pornographers. The offenders were highly motivated to commit unspeakable acts of sexual depravity against children

to create visual depictions of that abuse. The statutory penalty range and the guidelines did not contemplate teenagers "sexting" each other, or that every person over the age of 13 would have their own video-capable smart phone. In this case, the production element of the crime was incidental to Brian Wood's efforts, at ages 21 and 22, to seduce young teenage girls into sexual relationships with him. And while the creation of visual depictions of his victims engaging in sexually explicit conduct was criminal and abhorrent, it was not as serious or as depraved as many other more typical instances of production of CSAM.

**Conclusion**

For the reasons stated above, a downward variance to a range of 180 to 210 months is appropriate. A sentence of 180 months is sufficient and not more than necessary to promote respect for the law, provide a just punishment, afford adequate individual and general deterrence, protect the public, and to provide Brian Wood with the correctional treatment he needs in the most effective manner. As articulated by the government in its sentencing memo, a sentence within the range of 180 to 210 months does not result in an unwarranted disparity among offenders with similar records who have been found guilty of similar conduct.

Dated: November 10, 2026

By: *<u>/s/ H. Samuel Ansell</u>*

H. Samuel Ansell
Assistant Federal Public Defender
Office of the Federal Public Defender
District of Vermont
Counsel for Brian Wood